**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| **Plaintiff,** | |
| v. | **Case No.** |
| **KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES**; and **STEVEN J. STACK** in his Official Capacity as Secretary for the Kentucky Cabinet for Health and Family Services, | **COMPLAINT FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTION** |
| **Defendants.** | |

**COMPLAINT**

Plaintiff, United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

**PRELIMINARY STATEMENT**

1.      The Supplemental Nutrition Assistance Program ("SNAP") is the nation's largest domestic food assistance program, serving approximately 37 million people in an average month at the cost of about $100 billion per year to American taxpayers. SNAP serves as an essential safety net that prevents many Americans from going hungry. Just as essential, however, is the United States's duty to protect the program from waste, fraud, and abuse, safeguarding taxpayer funds and preserving the program for future generations.

2.      The Food and Nutrition Act of 2008 ("FNA") authorizes SNAP. Through the FNA, Congress granted the U.S. Department of Agriculture ("USDA") broad authority to implement and administer SNAP. While states, the District of Columbia, Guam, and the U.S. Virgin Islands, through their designated SNAP agencies, are responsible for certifying household eligibility and

issuing benefits, USDA is responsible for systemic program oversight. These responsibilities require USDA to determine whether states are lawfully administering the program. To carry out these responsibilities, Congress granted USDA authority to inspect and audit state records. 7 U.S.C. § 2020(a)(3).

3.      In May 2025, President Trump issued Executive Order 14,243 which required federal agencies to eliminate information silos and consolidate federally funded program data to identify and eliminate waste, fraud, and abuse. *See* Stopping Waste, Fraud, and Abuse by Eliminating Information Silos, Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 20, 2025) (the "Executive Order" or "EO 14,243"). The Executive Order specifically directed agency heads to facilitate federal access, "to the maximum extent consistent with law," to "all State programs that receive Federal funding," such as SNAP. *Id.* § 3(c). Under that mandate, USDA exercised its statutory oversight authority and requested that Defendants, the SNAP agency for each of the remaining fifty states, and the SNAP agency for the District of Columbia (collectively, "State Agencies")[1] produce certain SNAP eligibility and benefit transaction records. USDA requested these records to consolidate and analyze them in a secure, centralized database (the "SNAP Information Database").

4.      To date, twenty-nine State Agencies have provided USDA with records. USDA's preliminary analysis of these records indicates there could be up to $3 billion of undetected waste, fraud, and abuse per year in these states alone.[2] For example, USDA found these State Agencies

---

[1] USDA did not request records from the territories of Guam and the U.S. Virgin Islands.

[2] As explained in greater detail, *infra*, ¶¶ 40–42, USDA calculated this figure by using one month of records to extrapolate potential overpayments over a twelve-month period. Additionally, all

certified over 1 million individuals to receive SNAP benefits who were potentially ineligible, including individuals who were dead or whose social security numbers were associated with multiple SNAP certifications within a single state or among multiple states. USDA's findings are supported by an alarming national trend where State Agencies, including Defendants, have made excessive SNAP overpayments in recent years, which indicates that State Agencies have failed to vet applicants properly, disqualify households that become ineligible, or reduce payments based on changes to household circumstances.

5.      However, twenty-two State Agencies, including Defendants, ultimately refused to comply with USDA's records request. USDA responded with a letter warning of the potential disallowance of administrative reimbursements to these State Agencies. USDA did not threaten to withhold, reduce, or otherwise affect SNAP benefits for individual recipients. In July 2025, Kentucky Governor Andy Beshear's Office ("Governor Beshear's Office") together with the attorneys general for the other non-compliant states and the District of Columbia (collectively, "Non-Compliant States") filed a complaint against USDA, its Secretary, and its Office of Inspector General in the United States District Court for the Northern District of California (the "California Court" or "court"). Non-Compliant States' complaint sought a declaration that USDA's records request was unlawful and an injunction barring USDA from disallowing certain administrative reimbursements to state agencies for administering SNAP. Although Governor Beshear's Office represented the Commonwealth of Kentucky in the California lawsuit, the Defendants here — Kentucky Cabinet for Health and Family Services and Secretary Steven J. Stack — were not parties.

---

State Agencies periodically review households for continued eligibility and disqualification, which USDA did not factor into its preliminary analysis.

3

6. In October 2025 and February 2026, the California Court rejected most of Non-Compliant States' claims and ultimately confirmed USDA's statutory right to obtain the records subject to data and security protocols agreed upon by USDA and Non-Compliant States. The California Court also found that Non-Compliant States cannot unreasonably reject USDA's proposed protocols. The California Court nonetheless issued limited preliminary relief against USDA's records requests dated May 6, 2025 ("First Records Request") and November 24, 2025 ("Second Records Request"). In issuing this limited relief, the California Court made several observations relevant to this suit: that USDA's First Records Request was deficient under Section 2020(a)(3) because it completely lacked data and security protocols and the Second Records Request was deficient because it included protocols that were inconsistent with certain redisclosure limitations in the FNA. *See* 7 U.S.C. § 2020(a)(3), (e)(8)(A).

7. While the California case remains ongoing, it involves only the question of whether USDA can disallow administrative funds as a penalty for Non-Compliant States' failures to comply with USDA's records request. Where State Agencies fail to comply with the FNA, USDA's Secretary may also refer the violation to the Attorney General, who can seek injunctive relief in the home district of the non-compliant State Agency. 7 U.S.C. § 2020(g). Thus, as to Defendants, Congress provided exclusive venue in this Court to adjudicate this claim.

8. On May 15, 2026, USDA rescinded its prior records requests and sent a new request ("Third Records Request") to Defendants along with proposed data and security protocols that conform to the California Court's guidance. USDA sent this letter directly to Defendants, rather than to Governor Beshear's Office — a prerequisite to obtain injunctive relief against Defendants. *See* 7 U.S.C. § 2020(g). Defendants continue to refuse to provide the records, accept USDA's proposed data and security protocols, or negotiate in good faith regarding the same.

9.     The records that USDA requested Defendants produce are necessary to fulfill its statutory responsibilities to oversee SNAP and comply with Executive Order 14,243. Indeed, based on USDA's analysis of the compliant State Agencies' records, national overpayment trends, and Defendants' recent history of excessive overpayments, it is extremely likely that Defendants' records will show significant waste, fraud, and abuse that Defendants have not detected or eliminated. Defendants have unlawfully withheld the records by (1) making their agreement to data and security protocols a condition precedent to producing the records, and (2) avoiding an agreement altogether by unreasonably rejecting USDA's proposed data and security protocols. Left with no other recourse, Plaintiff brings this action to declare that Defendants are in violation of the FNA and order them to provide the records.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345 and 7 U.S.C. § 2020(g).

11.     Venue is statutorily required in this District under 7 U.S.C. § 2020(g) because it is the geographic area in which Defendants are located and over which the Court has jurisdiction.

12.     Venue is also proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this Complaint occurred in this District.

## PARTIES

13.     Plaintiff United States of America enforces federal laws through its executive agencies, including the U.S. Department of Justice. The U.S. Department of Justice, through the Attorney General, has authority to enforce the FNA upon referral by the Secretary of Agriculture under 7 U.S.C. § 2020(g). The Secretary of Agriculture referred this matter to the Attorney General

5

and requested that injunctive relief be sought to require compliance "forthwith" by Defendants. *See* 7 U.S.C. § 2020(g).

14.     Defendant Kentucky Cabinet for Health and Family Services ("KCHFS") is the State Agency responsible for administration of SNAP in the Commonwealth of Kentucky under Kentucky law. Ky. Rev. Stat. ("KRS") § 194A.010. Defendant KCHFS is responsible for the administration of the federally aided public assistance programs within the Commonwealth. *See* 7 U.S.C. §§ 2012(s), 2020(g).

15.     Defendant Steven J. Stack is the Secretary for the Kentucky Cabinet for Health and Family Services and is being sued in his official capacity. Secretary Stack oversees and administers the Commonwealth of Kentucky's participation in SNAP under Kentucky law. *See* KRS § 194A.050(1).

## LEGAL BACKGROUND

### A.     Overview of the Food and Nutrition Act of 2008

16.     In 2008, Congress created the Supplemental Nutrition Assistance Program — also known as "SNAP" — through the FNA. *See* 7 U.S.C. § 2011 *et seq*.; 7 C.F.R. §§ 271–92. SNAP is the successor to the Food Stamp Program and is the nation's largest domestic food assistance program, serving over 37 million people in an average month. Decl. of Shiela Corley ¶ 26, attached as Exhibit A ("Ex. A").

17.     Congress created SNAP to "alleviate . . . hunger and malnutrition" and to "permit low-income households to obtain a more nutritious diet." 7 U.S.C. § 2011. To meet this goal, SNAP supplements the food purchasing power of eligible households with SNAP benefits, which their members may only use to purchase eligible food items at authorized food stores. *Id.* §§ 2011, 2013.

6

18.     The USDA administers SNAP with the states, a term which includes the District of Columbia, Guam, and the United States Virgin Islands. *Id.* §§ 2012(r); 2013; 2020; 2025. The federal government funds all SNAP benefits and reimburses states for half of their costs to administer the program. *Id.* §§ 2013, 2025; Ex. A ¶ 27. SNAP costs American taxpayers approximately $100 billion per year. *Id.*

### B.     State Agencies' Household Certification and Benefit Payment Duties

19.     The FNA assigns different administrative duties to USDA and the states. *E.g.*, 7 U.S.C. §§ 2020, 2025. USDA is primarily responsible for implementation, program integrity, and state oversight while states are primarily responsible for day-to-day operations. *Id.* §§ 2012(s), 2014(b), 2020, 2022–25; 7 C.F.R. § 271.4. States must certify a SNAP applicant's eligibility, determine correct payment amounts, issue payments via Electronic Benefit Transfer ("EBT") cards, and keep records sufficient for USDA to determine whether they responsibly and lawfully administer the program. 7 U.S.C. § 2020; 7 C.F.R. § 271.4. In turn, states delegate operations to their designated State Agencies that, among other things, contract with third-party processors to facilitate EBT payments to eligible households. *See* 7 U.S.C. §§ 2012(s), 2020(e), 2016; 7 C.F.R. §§ 271.4, 272.2, 273; Ex. A ¶¶ 28–30.

20.     The FNA describes a benefit recipient as a "household," which must be either "(A) an individual who lives alone or who, while living with others, customarily purchases food and prepares meals for home consumption separate and apart from the others; or (B) a group of individuals who live together and customarily purchase food and prepare meals together for home consumption." 7 U.S.C. § 2012(m)(1). Eligibility for SNAP benefits turns on many factors about a household's income and other financial resources, which ultimately must be a "limiting factor"

to "obtain[ing] a more nutritious diet." 7 U.S.C. § 2014. The FNA also expressly provides

additional factors that bear on a household's eligibility, including:

a.   certain convictions for program benefit fraud, *Id.* § 2015(b);

b.   the refusal to provide necessary eligibility information to state agencies, *id.* § 2015(c), which includes a social security number, *id.* § 2025(e);

c.   the refusal to register for employment at the time of application and periodically thereafter, participate in an employment and training program, or accept certain offers of employment, all depending on the age of the household applicant, *id.* § 2015(d);

d.   certain students enrolled at least half-time in an institution of higher education, depending on the student's age, *id.* § 2015(e);

e.   certain alien classifications, depending on their residency and immigration status, *id.* § 2015(f).

21.   Once a State Agency determines that a household is eligible, it must provide benefit

allotments tailored to the household's needs according to the household's size and net income after

specific exclusions and deductions. *Id.* § 2014. An "allotment" is "the total value of benefits a

household is authorized to receive during each month" according to the FNA's prescribed

calculations *Id.* §§ 2012(b); 2017(a). Some individuals must be considered part of the same

household and thus are not permitted to certify as separate households to collect separate

allotments. These individuals include spouses, "a person under 22 years of age" who lives with a

parent, and a child "under 18 years of age who lives with and is under the parental control of a

household member other than his or her parent." 7 C.F.R. § 273.1(b)(1).

22.   Only qualifying household members are permitted to count towards a household's

benefit allotment, meaning a household may not claim ineligible members to increase its allotment.

7 C.F.R. § 273.1(b)(7). However, certain ineligible household members must have all or part of

their income and expenses attributed to the household, potentially decreasing the household's

8

allotment. *Id.* § 273.11(c). These ineligible household members can include certain aliens, felons, and individuals who fail to provide a social security number, among others. *Id.* § 273.11(c)(1)–(3).

23.     To ensure all of these requirements are met, State Agencies must collect many categories of information from households during the certification process — such as social security numbers, dates of birth, immigration status, student status, criminal history, street address, mailing address, household size, and household members — that they use to determine eligibility for benefits, as well as the quantity of benefits for households that are eligible. *See* 7 U.S.C. §§ 2013–15; 7 C.F.R. §§ 273.1, 273.11(c).

### C.     USDA's Program Integrity and Oversight Duties

24.     Through the FNA, Congress made USDA the primary administrator and watchdog of SNAP, giving it broad authority to implement, administer, and oversee the program. 7 U.S.C. § 2013(a)(1), (c). With this authority comes responsibilities that USDA must carry out to ensure compliance with the FNA. Besides program implementation through rulemaking, Congress enumerated USDA's many specific oversight responsibilities throughout the statute. For example, the FNA requires that USDA "shall" perform the following duties:

   a.     Prescribe appropriate procedures for the delivery of benefits to benefit issuers and for the subsequent controls to be placed over such benefits by benefit issuers in order to ensure adequate accountability, *id.* § 2016(d).

   b.     Issue guidance to State Agencies on an ongoing basis that describe security measures that are effective in detecting and preventing theft of benefits, *id.* § 2016a(a)(1). Subject to conditions, USDA must use certain funds to require State Agencies to replace benefits that are determined by the State Agency to have been stolen through certain fraudulent methods, *id.* § 2016a(b). USDA must also disqualify or penalize retail food stores for certain violations of the FNA, *id.* § 2021(a), (b)(3), (c).

   c.     Regulate the authorization and approval of retail food stores and private establishments that can accept EBT payments, *id.* § 2018(a)(2), (a)(3), (b), (h)(1).

9

d.  Develop standards for identifying major changes in the operations of State Agencies, *id.* § 2020(a)(4).

e.  Review for approval every State Agency's "plan of operation," which specifies the manner in which SNAP will be conducted within each state or subdivision, *id.* § 2020(d), and ensure each plan of operation meets the FNA's requirements, *id.* § 2020(e).

f.  Determine whether State Agencies overissued benefits to a substantial number of households in a fiscal year as a result of a major systemic error by the State Agency, *id.* § 2022(b)(5), and upon such a determination, must establish a claim against the State Agency equal to the value of the overissuance caused by the systemic error, *id.* § 2022(b)(5)(B)(iii).

g.  Carry out a "quality control system" that makes State Agencies with high payment error rates share in the cost of payment error, *id.* § 2025(c).

h.  Periodically assess liability amounts against State Agencies responsible for payment error rates over a certain threshold that exceeds the national average, but which only allows USDA to recoup a faction of the loss, *id.* § 2025(c)(1)(C)–(F).

i.  Develop and require State Agencies with payment error rates equal to or greater than 6 percent to enter corrective action plans to reduce their payment errors, *id.* § 2025(c)(1)(G).

25.  USDA's program oversight functions extend well beyond fulfilling these obligations. *See e.g., id.* § 2011 *et seq.* For example, Congress expressly granted USDA the authority to require State Agencies found to have been negligent or fraudulent in their certification of applicant households to deposit at USDA's request "a sum equal to the face value of any benefits issued as a result of such negligence or fraud." *Id.* § 2020(h). Thus, the FNA makes abundantly clear that USDA is legally required to oversee SNAP's systemic program integrity; whereas State Agencies are responsible for policing households that receive benefits, USDA is responsible for policing State Agencies that dispense those benefits and the retail food stores that accept benefit payments. *See id.* §§ 2016(e), 2016a(b), 2020(a), 2020(d), 2020(e)(6)(A), 2020(h), 2020(g), 2022(b)(5), 2022(b)(5)(B)(iii), 2025(c).

D.   **USDA's Authority to Inspect and Audit Records and Refer Violations to the Attorney General for Injunctive Relief**

26.   Recognizing that access to relevant program information is essential to USDA's oversight responsibilities, Congress expressly granted USDA authority to make broad requests for records from State Agencies. This authority is codified in Section 2020(a)(3), which provides:

(a) State Responsibility

(3) Records

(A) In general

Each State agency shall keep such records as may be necessary to determine whether the program is being conducted in compliance with this chapter (including regulations issued under this chapter).

(B) Inspection and audit

All records, and the entire information systems in which records are contained, that are covered in subparagraph (A) shall—

(i) be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary; . . . [and] (iii) be preserved for such period of not less than 3 years as may be specified in regulations.

7 U.S.C. § 2020(a)(3).

27.   Each state must administer SNAP according to a USDA-approved plan of operation that includes safeguards that generally "prohibit the use or disclosure of information obtained from applicant households" subject to certain carveouts. 7 U.S.C. § 2020(e)(8).

28.   One such carveout permits the disclosure of certain SNAP records to USDA so that USDA can properly administer and enforce the FNA's requirements, subject to certain use and redisclosure limitations. *Id.* Specifically, Section 2020(e)(8)(A) provides that a State Agency's plan of operation shall include:

(8) safeguards which prohibit the use or disclosure of information obtained from applicant households, except that—

(A) the safeguards shall permit—

11

(i) the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and

(ii) the subsequent use of the information by persons described in clause (i) only for such administration or enforcement[.]

7 U.S.C. § 2020(e)(8)(A).

29.    In sum, the FNA provides in clear, mandatory language that a State Agency "shall" make available to USDA for inspection and audit "[a]ll records, and the entire information systems in which records are contained" that are in a State Agency's possession. *Id.* § 2020(a)(3)(B)(i). These records "shall" be available to USDA for inspection "subject to data and security protocols agreed to by the State agency and [the USDA] Secretary." *Id.* Read together, Section 2020(a)(3) requires State Agencies to provide records to USDA for inspection and audit purposes, and Section 2020(e)(8)(A) ensures that State Agencies' plans of operation include a vehicle for them to comply with USDA's requests, so long as the requests are limited to information used to administer and enforce the FNA. *See id.* § 2020(a)(3), (e)(8)(A).

30.    Section 2020(a)(3)'s language that records must be provided "subject to data and security protocols" indicates that the terms of sharing will be *governed by* or *controlled by* the terms of any protocols on which the State Agency and USDA agree. *See* 7 U.S.C. § 2020(a)(3)(B). Section 2020(a)(3) does not expressly condition a State Agency's obligation to provide records to USDA on prior agreement to data and security protocols. *See id.*

31.    Moreover, nothing in the FNA empowers State Agencies to unreasonably refuse to agree to data and security protocols to avoid providing the data. *See id.* Indeed, reading an implied veto into Section 2020(a)(3), by permitting State Agencies to decline indefinitely to enter data and security protocols, would impermissibly frustrate Congress's clear intent to give USDA mandatory access to the records in question. *See id.* USDA must be permitted to collect the records it requires

12

to fulfill its statutory duty to oversee SNAP and protect the public fisc from waste, fraud, and abuse. *See id.*

32.     A State Agency violates the FNA when it relies on an unreasonable rejection of USDA's proposed data and security protocols as a basis for refusing to comply with a Section 2020(a)(3) records request. *See id.* § 2020(a)(3), 2020(g). If USDA determines the violation is "without good cause," the FNA requires USDA to "immediately inform such State agency of such failure" and "allow the State agency a specified period of time for the correction of such failure." *Id.* § 2020(g). If the State Agency does not correct the failure within the specified time, USDA "may" refer the matter to the Attorney General "with a request that injunctive relief be sought to require compliance *forthwith*" by the State Agency. *Id.* (emphasis added).

33.     The FNA specifies that if the Attorney General files a complaint for injunctive relief, it must do so in the district court "having jurisdiction of the geographic area in which the State agency is located," and upon "a showing that noncompliance has occurred, appropriate injunctive relief shall issue . . . ." *Id.* § 2020(g).[3] Thus, Congress established exclusive venue for such a complaint in the home venue of the State Agency. *Id.* § 2020(g).

---

[3] Regardless of whether USDA refers a matter to the Department of Justice for injunctive relief, the FNA provides that USDA "shall" withhold certain funds from a noncompliant state as USDA deems appropriate related to administrative cost sharing, liability amounts, and cost sharing of the state's computerized recordkeeping system, subject to administrative and judicial review. *Id.* §§ 2020(g), 2025(a), (c), (g).

**STATEMENT OF FACTS**

A.   **USDA requested records from each State Agency in accordance with its obligations under federal law.**

34.   On March 20, 2025, President Trump issued Executive Order 14,243 to combat waste, fraud, and abuse across the federal government by eliminating information silos. EO 14,243. The Executive Order explains that "unnecessary barriers to Federal employees accessing Government data" create information silos, which generate "bureaucratic duplication and inefficiency" impinging on the "Government's ability to detect overpayments and fraud." EO 14,243 § 1.

35.   EO 14,243 directs agency heads, including the Secretary of Agriculture, to "take all necessary steps, to the maximum extent consistent with law," to ensure Federal officials have access to unclassified information "for purposes of pursuing Administration priorities related to the identification and elimination of waste, fraud, and abuse." EO 14,243 § 3(a). These steps include ensuring that federal agencies have "access to comprehensive data from all State programs that receive Federal funding," such as SNAP, "including, as appropriate, data generated by those programs but maintained in third-party databases." EO 14,243 § 3(c).

36.   On May 6, 2025, USDA addressed its First Records Request letter to Defendant KCHFS and the other State Agencies[4] under the directive of EO 14,243 and the authority of the FNA, including under 7 U.S.C. § 2020(a)(3) and 2020(e)(8)(A). Ex. A ¶¶ 5, 32–33; Ex. 1. The letter requested that each State Agency produce certain SNAP records pertaining to each household's eligibility, members, and benefit allotments over the preceding five years. Ex. 1 at 3. The letter explained that the request's purpose was to "consolidate SNAP data" into a centralized

---

[4] USDA did not send requests to the territories of Guam and the U.S. Virgin Islands. Ex. A ¶ 32.

14

USDA-managed database to eliminate "information silos," "enhance the Government's ability to detect overpayments and fraud," and "confirm that SNAP is being administered appropriately and lawfully." *Id*. at 2.

37.    On June 23, 2025, USDA published a System of Records Notice ("SORN")[5] in the Federal Register that gave notice of USDA's "new system of records" entitled the "National Supplemental Nutrition Assistance Program (SNAP) Information Database." 90 FR 26521–22 (June 23, 2025). The SORN explained that the SNAP Information Database is "owned, administered, and secured by the [USDA] Food and Nutrition Service" and its "primary purposes" are "to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity." *Id.* at 26521.

38.    The SORN described the "categories of individuals" who are covered by the SNAP Information Database as "[i]ndividuals who have received, are currently receiving, or have applied to receive SNAP benefits," and the "categories of records" that go in the database as those containing:

> personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients. . . . [and] information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates.

---

[5] The Privacy Act of 1974, 5 U.S.C. § 552a *et seq.*, requires federally maintained systems of records pertaining to individuals to meet certain privacy and notice requirements. Among these is the requirement that federal agencies publish notice in the Federal Register of any new system they create. *Id.* § 552a(e)(4).

*Id.* at 26522. The SORN also provided eleven "routine uses" that allow USDA to disclose these records to others in limited circumstances, including, in relevant part, "[w]hen a record on its face, or in conjunction with other records, indicates a violation or potential violation of law . . . USDA/FNA may disclose the record to the appropriate agency, whether Federal, foreign, State, local, or tribal." *Id.* at 26522–23. The SORN provided that the routine uses are limited to those authorized by FNA Sections 2020(a)(3) and (e)(8), among other authorities. *Id.* at 26522.

39. On June 15, 2026, USDA published a revised SORN in the Federal Register giving notice of several changes to the SNAP Information Database. 91 FR 35948–49 (June 15, 2026). Among other things, the revised SORN stated "more clearly that all routine uses are subject to applicable legal requirements, including the Privacy Act and the Food and Nutrition Act." *Id.* at 35949. The revised SORN modified several of the routine uses to reflect that the SNAP Information Database was subject to the FNA's use and redisclosure restrictions on information obtained from household applicants under § 2020(e)(8) and removed the routine use that previously stated "foreign" entities could potentially receive records from the Database. *Id.* at 35949–51. The revised SORN also clarified "that records in the National SNAP Information Database are maintained electronically and hosted in a FedRAMP High certified cloud infrastructure environment." *Id.* at 35949.

**B.    Responses to USDA's records request and other evidence reveal potential widespread waste, fraud, and abuse.**

1. Twenty-nine State Agencies, but not Defendants here, complied with USDA's request by providing USDA with five years of their SNAP records pertaining to household eligibility, allotments, and EBT transactions. Ex. A ¶ 40. However, USDA cannot complete its analysis and eliminate systemic problems until it has the records it requested all State Agencies to produce. *Id*. ¶ 42. For example, a potentially large percentage of waste, fraud, and abuse occurs

16

when SNAP recipients collect benefits from multiple State Agencies. *Id*. Without Defendants' records, for example, USDA cannot determine whether recipients in states surrounding Kentucky are collecting payments both from State Agencies in those states and from Defendants in Kentucky. *Id*.

2.      Despite these limitations, USDA concluded there could be substantial waste, fraud, and abuse in SNAP based on its ongoing and preliminary data analysis of compliant State Agencies' records.[6] Ex. A ¶¶ 43–44. To reach this conclusion, USDA determined that the compliant State Agencies had certified over 1 million apparently ineligible recipients to receive SNAP benefits during the month of July 2025. *Id*. USDA determined these recipients were ineligible based on obvious red flags — including dead recipients, recipients who were certified to receive multiple allotments within a single state or among multiple states, recipients with dummy social security numbers (i.e., 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 or 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), and previously disqualified recipients. *Id*. USDA determined each flagged recipient's average per month benefit amount to be $188, or $2,256 annually per recipient. USDA chose this amount because it represented the average benefit amount per person in fiscal year 2025. USDA then calculated "annual implied dollar" amounts for each ineligibility category by assuming State Agencies would continue to certify and pay each of these recipients SNAP benefits over the next twelve months — the most common certification period length. *Id*. USDA thereby concluded that the compliant State Agencies could pay up to $3 billion in SNAP overpayments over course of the year. *Id*.

3.      Because State Agencies follow different practices in how and when they review households and household members for changes in eligibility criteria, some of the compliant State

---

[6] *See* U.S. Depart. Agric., *USDA SNAP Program Integrity Data Team: Preliminary Report* (May 13, 2026), https://perma.cc/ZL8D-HYHD.

Agencies would likely identify and eventually disqualify some of these apparently ineligible households or would otherwise reduce their allotments. *Id*. ¶ 45. Nevertheless, USDA's establishment of the SNAP Information Database as a central repository of the records will allow USDA to identify these potentially ineligible recipients and stop overpayments with greater precision, regularity, and efficiency than State Agencies. *Id*.

4.      The results of USDA's preliminary analysis are supported by excessive overpayment error rates that have soared across the country over the past nine years. *Id*. ¶ 49. As part of the FNA's quality control system, USDA must periodically review statistical samples of household records from State Agencies to determine each state's annual payment error rate. 7 U.S.C. § 2025(c)(1)(B); Ex. A ¶ 46. Payment error rates are the sum of a State Agency's overpayment and underpayment rates. 7 U.S.C. § 2025(c)(2); Ex. A ¶ 46. Whereas overpayment error rates reflect payments made by State Agencies that exceed the allotments to which households are lawfully entitled, underpayment rates reflect payments made below the allotments to which households are lawfully entitled. 7 U.S.C. § 2025(c)(2); Ex. A ¶ 46. Overpayment error rates represent waste and abuse. 7 U.S.C. § 2025(c)(2); Ex. A ¶ 46. Under the FNA, State Agencies that have payment error rates that consistently exceed certain thresholds may be assigned a liability amount or subject to remedial measures. 7 U.S.C. § 2025(c)(1)(C), (c)(1)(G); Ex. A ¶ 46. One of these thresholds is a 6 percent payment error rate. 7 U.S.C. § 2025(c)(1)(G); 7 C.F.R. § 275.16. If a State Agency's payment error rate meets or exceeds this 6 percent threshold in a fiscal year, then the State Agency must enter a USDA-supervised corrective action plan to improve its administration of SNAP and address the root causes(s) of its payment errors. 7 U.S.C. § 2025(c)(1)(G); 7 C.F.R. § 275.16.

5.      The national average overpayment error rate in 2017 was 5.19 percent of national allotments. In 2025, it was 9.28 percent, which represents over $8.8 billion in waste and abuse nationwide in that year alone. Ex. A ¶ 49. The national average overpayment error rate surged in the years since the COVID-19 pandemic. *Id.* In the three fiscal years preceding the pandemic, the national overpayment error rates were 5.19 (FY 2017), 5.59 (FY 2018), and 6.18 (FY 2019) percent of national allotments; and in the four fiscal years for which there are published data following the pandemic, the overpayment error rates were 9.84 (FY 2022), 10.03 (FY 2023), 9.26 (FY 2024), and 9.28 (FY 2025) percent of national allotments. *Id.* This surge was due in part to Congress's passage of temporary laws that allowed State Agencies to extend eligibility certification periods and suspend in-person interviews of program applicants. *E.g., Continuing Appropriations Act, 2021 and Other Extensions Act*, Pub. L. No. 116-159, § 4603(a)(2), 134 Stat. 709, 746 (2020); Ex. A ¶ 49. The actual overpayment error rates during 2020 and 2021 could be much higher but are unknown — State Agencies were not required to provide USDA with sufficient information through the quality control system to establish rates during that period. Ex. A ¶ 49. USDA has now sought complete records from this period for its SNAP Information Database to analyze them for the first time. *Id.*

6.      State Agencies often make improper payments because they fail to verify household eligibility based on citizenship, education, employment, finances, household size, identity, and residence. *Id.* ¶ 50. When collecting and analyzing data to establish overpayment error rates, each State Agency's practice varies depending on program structure, staff expertise, and state agency priorities. *Id.* Some State Agencies have limited resources to perform thorough analysis of root causes, and some State Agencies do not employ statisticians. *Id.*

19

7.      Overpayment error rates based on sampling of State Agency cases can lead to the assessment of liability amounts as part of the FNA's quality control system. However, this system has limits aligned with its purpose — as a system based on statistical samples of household case records, it is incapable of identifying for review and removal all apparently ineligible households. *Id.* ¶¶ 47–48, 51. Instead, the system is designed to give State Agencies evidence of systemic improper payments and prompt them to take the next step of eliminating root causes to avoid potential penalties in subsequent years. *Id.* The recent surge in the national average overpayment error rate indicates that states — while holding all the records — are failing to take appropriate action, and thus, failing to comply with the law. *Id.*

8.      USDA has also detected numerous instances of major systemic failures in the administration of SNAP by certain State Agencies, including Rhode Island and the District of Columbia, among others. *Id.* ¶ 52. For example, in May 2024, USDA established a claim against Rhode Island for certain overpayments that occurred within the state from September 2016 through December 2019 as the result of a major systemic failure caused by problems with its eligibility system. *Id.* USDA's claim against Rhode Island for overpayments was an amount exceeding $37 million. *Id.* Despite being notified by USDA that it would be liable for this failure in August 2017, Rhode Island failed to address it for another two years. *Id.*

9.      Similarly, in October 2017, USDA notified the District of Columbia that it would be liable for overpayments that began in October 2016 that were the result of a major systemic failure. *Id.* ¶ 53. Despite this notice, the District of Columbia's major systemic failure continued to produce overpayments through December 2019. *Id.* In May 2024, USDA informed the District that it would now be liable for over $30 million in overpayments as a result of the failure. *Id.*

20

10.    As these cases demonstrate, major systemic failures result in overpayments that can involve significant sums of money and go undetected for years. *Id.* ¶ 54. This can exacerbate the consequences for a State Agency because the Secretary may prohibit it from collecting these overpayments from some or all of the impacted households. *Id.* Even when they are detected, the appeals process and uncertainty over calculation accuracy can take years to resolve. *Id.* Although USDA informed State Agencies for the District of Columbia and Rhode Island that they would be liable for these overpayments because of their major systemic failures, their appeals are still active almost a decade after the failures first occurred. *Id.* With access to the records that USDA required State Agencies to produce, USDA would be able to review every eligibility and benefit level determination for accuracy and thus detect major systemic failures occurring within a state earlier, helping to mitigate the total dollar value of overpayments and therefore the total dollar value of claims established against the State Agency. *Id.* These records would also permit USDA to accurately calculate overpayment amounts instead of relying on estimations. *Id.*

11.    State Agency personnel have also engaged in intentional fraud and abuse of SNAP. *Id.* ¶ 55. For example, in January 2026, a former California State Agency eligibility worker pleaded guilty to aggravated identity theft for stealing individuals' identities and fraudulently obtaining SNAP benefits in their names. *Id.* For a nearly three-year period, the employee improperly used county databases to which she had access through her job to obtain identifying information for individuals who either were not United States citizens, were elderly, or were deceased. *Id.* She then secretly approved these individuals to receive or continue receiving SNAP benefits, printed EBT cards in their names with the benefits deposited thereon and spent the money on herself and her family members. *Id.*

21

12.     In other cases, USDA has identified State Agency employees engaged in apparent program abuse and disregard for their statutory duties. *Id.* ¶ 56. For example, in a video-recorded training for its SNAP eligibility workers, the Program Manager for Minnesota's State Agency admitted that "fraud has never been a big focus for me" while also acknowledging that fraud "[e]xists in government from top to bottom." *Id.* The training instructed State Agency officials responsible for Minnesota's SNAP eligibility determinations and fraud referrals to consider "why" someone has violated SNAP. *Id.* The training also urged the officials to find ways to avoid adverse outcomes for household recipients, disparaging as "punishment" income limits on their eligibility for receiving public assistance. *Id.* Without USDA's access to State Agency records, these instances of fraud and abuse can go undetected and unabated for longer periods of time. *Id.*

### C.     Evidence of Defendants' Excessive Overpayments

13.     Defendants' administration of SNAP in Kentucky has followed the national trend and produced excessive overpayments in recent years. *Id.* ¶ 57. Defendants' payment error rate has exceeded the standard tolerance level of 6 percent in five of the past seven years for which there is reported data. *Id*. Thus, Defendants have been statutorily required to participate in corrective action plans under the supervision of USDA. *Id.*

14.     Defendants' overpayment error rate increased from 5.05 percent of total Kentucky allotments for fiscal year 2022 to 8.23 percent for fiscal year 2024, before dropping to 4.02 percent for fiscal year 2025. *Id.* ¶ 58. As Defendants paid out over $1.1 billion in federally funded SNAP benefits in fiscal year 2024, their overpayment error rate produced approximately $90 million in improper payments in that year alone — all due to waste and abuse. *Id.* These excessive overpayments are evidence that Defendants failed to enforce SNAP at the State Agency level by

failing to identify and eliminate root causes of errors, including ineligibility, a problem that USDA

will identify through its SNAP Information Database. *Id.*

   **D.**   **Litigation in the Northern District of California Concerning Disallowance of Federal Funds**

  15.  Twenty-two State Agencies, including Defendants, ultimately failed to provide

records in response to USDA's First Records Request. Ex. A ¶ 40. On July 9, 23, and 25, 2025,

USDA sent follow-up letters to these State Agencies asking them to produce the records identified

in the SORN. *Id.* ¶¶ 6–8; Exs. 2–4. USDA's letter dated July 25th warned that USDA was prepared

to take specific agency action — specifically, that "[f]ailure to take the steps necessary to provide

the relevant data to [USDA] may trigger noncompliance procedures codified 7 U.S.C. § 2020(g)."

Ex. A ¶ 8; Ex. 4 at 2.

  16.  On July 28, 2025, Governor Beshear's Office, and the attorneys general for the

Non-Compliant States[7] filed a complaint against USDA, its Secretary, and its Office of Inspector

---

[7] Non-Compliant States included the State of California, the State of New York, the State of Arizona, the State of Colorado, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Hawai'i, the State of Illinois, the Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, the State of Maine, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of Oregon, plaintiff the Office of the Governor ex rel. Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, the State of Rhode Island, the State of Washington, and the State of Wisconsin. *See* Amended Compl. for Decl. and Inj. Relief ¶¶ 25–47, *California v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N. D. Cal. Sept. 22, 2025), ECF No. 84. Pennsylvania Governor Josh Shapiro joined the lawsuit in an amended complaint in September 2025. *See id.* ¶ 44. Despite being a party to the California lawsuit, the State Agency for Nevada provided its records to USDA. *See* Notice, *California v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N. D. Cal. Sept. 15, 2025), ECF No. 78; Ex. A ¶ 41. The State Agency for Kansas initially refused to provide its records but did not join Non-Compliant States' lawsuit; however, between

General in the San Francisco Division of the District Court for the Northern District of California. Pl.'s Comp., *California v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N.D. Cal. July 28, 2025), ECF No. 1. Non-Compliant States claimed they were withholding records from USDA based on their purported suspicion that USDA would share the records with federal immigration authorities. *See, e.g.*, ¶ 125 (claiming that other federal agencies have shared other program-benefit information with ICE for immigration enforcement and assuming, without evidence or support, that USDA would do the same).

17.    In their complaint, Non-Compliant States asserted several claims under the Administrative Procedure Act ("APA"), a claim titled "*ultra vires*," and a claim under the Spending Clause of the United States Constitution. *Id.* ¶¶ 295–365. They also sought various relief from the California Court, including a declaration that USDA's request for records was unlawful, a declaration that the defendants "cannot lawfully disclose the requested SNAP data to DOGE or DHS for any purposes, including immigration enforcement, other than SNAP administration," an injunction to stop the defendants from making their "demand for SNAP data . . . as described herein," an injunction to stop the defendants from "initiating noncompliance procedures against" Non-Compliant States, and an order that sets aside the [USDA's] "pending demands." *Id.* pp. 77–78.

18.    On August 12, 2025, USDA sent an "advance notice" letter under 7 C.F.R. § 276.4 to each Non-Compliant State except the District of Columbia warning they were subject to suspension or disallowance of federal funding to reimburse their SNAP administrative costs —

---

March and April 2026, the State Agency for Kansas entered into an agreement with USDA and provided its records. Ex. A ¶ 41.

but not SNAP benefit funding — if they did not comply with the records request by a date certain. Ex. A ¶ 9; Ex. 5 at 3. USDA sent this letter to the District of Columbia on August 20, 2025. Ex. A ¶ 9.

19.     On August 18, 2025, Non-Compliant States filed a motion before the California Court for a preliminary injunction to bar "USDA's demand for SNAP applicant and recipient data" and its "institution of noncompliance procedures," which "could lead to significant funding cuts for States that refuse to comply with the data demand."[8] Pl.'s Notice and Mot. for Stay or Prelim. Inj. at 1, *California et al. v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N.D. Cal. Aug. 18, 2025), ECF 59.

20.     On August 20, 2025, USDA sent each Non-Compliant State except the District of Columbia a "formal warning" letter that required them to produce the records within 30 days, or USDA would disallow a certain sum of federal funding for their SNAP administrative costs for each quarter of non-compliance. Ex. A ¶ 10; Ex. 6 at 2–3. USDA sent this letter to the District of Columbia on August 26, 2025. Ex. A ¶ 10.

21.     On October 15, 2025, the California Court granted Non-Compliant States' request for a preliminary injunction on very narrow grounds. *See* Prelim. Inj. Order, *California et al. v. U.S. Dep't of Agric.*, 25-cv-06310-MMC, (N.D. Cal. Oct. 15, 2025), ECF No. 106 at 7 & n.9, 19–21. The California Court found that most of Non-Compliant States' claims were not likely to succeed on the merits, including their *ultra vires* claim and most of the claims they styled under

---

[8] On September 18, 2025, the California Court issued a temporary restraining order against USDA and other defendants until the court could receive full briefing and issue a ruling on Non-Compliant States' motion. Order Granting Temporary Restraining Order as to All Plaintiff States Other Than State of Nevada, *California v. U.S. Dep't of Agric.*, No. 25-cv-06310-MMC (N.D. Cal. Sept. 18, 2025), ECF 83.

the APA.[9] *Id.* The court did find two of their claims meritorious — that USDA's records request, as it existed at the time, was likely not in compliance with § 2020(a)(3) and § 2020(e)(8)(A). *Id.* at 13–19.

22.     The California Court first distinguished the two provisions, observing § 2020(a)(3) only referenced USDA as the authorized recipient of records, covered a broader category of records, and required a data and security protocols agreement, whereas § 2020(e)(8)(A) referenced a broad category of persons authorized to receive records which include USDA, covered a narrower group of records, and did not require a protocols agreement. *Id.* at 13–19, 15 & n.18. As to § 2020(a)(3), the California Court found that Non-Compliant States would likely prevail on their claim because it was "undisputed" at the time that the parties had neither negotiated nor entered into the protocols agreement required by that provision of the statute. *Id.* at 12 & n.14. The California Court found this left "only the question whether [USDA's] demand can be made under § 2020(e)(8)(A)," which the court concluded did not provide USDA with separate authority from § 2020(a)(3) to request the records. *Id.* The California Court interpreted the operative term of § 2020(e)(8)(A) — "shall permit" — to be permissive based on the language of surrounding

---

[9] The California Court rejected the following of Non-Compliant States' APA-styled claims because they were unlikely to succeed on their merits: that USDA (1) violated the Computer Matching Act, (2) violated the Paperwork Reduction Act, (3) failed to provide an explanation for a policy change or that such a change occurred, (4) failed to demonstrate a rational connection between the SNAP Information Database and the purpose of eliminating waste, fraud, and abuse, (5) failed to consider the possibility of computer hackers, (6) failed to consider the chilling effect on individuals seeking benefits, (7) failed to consider the burden on State agencies to organize and submit the requested records, (8) and failed to consider public comments submitted in response to the SORN. *Id.* at 19–21. The California Court did not consider Non-Compliant States' Spending Clause claim because they did not raise it in their motion for the preliminary injunction. *Id.* at 7 & n.9.

26

subsections, meaning Non-Compliant States could refuse USDA's request for records under that provision of the statute.[10] *Id.* at 17.

23.     Regardless, the California Court reasoned, § 2020(e)(8)(A) was narrower than § 2020(a)(3) because it only covered "information obtained from household applicants" and was subject to use and redisclosure limitations. *Id.* at 18–19. The California Court observed that USDA's records request covered more than just household-obtained information, such as EBT transaction information, and several of the SORN's "routine uses" would permit USDA to redisclose the records to others for purposes prohibited by § 2020(e)(8). *Id.* Thus, the California Court found USDA's records request did not comply with § 2020(e)(8)'s requirements even if the court construed the provision to give USDA a separate right to the records. *Id.*

24.     While foreclosing § 2020(e)(8)(A) as a separate authority to obtain the records, the California Court nevertheless provided USDA with a roadmap to obtain them. *Id.* at 15. The California Court found that unlike § 2020(e)(8)(A), § 2020(a)(3) uses "clear, mandatory language, specifically, 'shall . . . be made available for inspection and audit,' thereby giving USDA the right to obtain, subject to data and security protocols, all records necessary to determine whether the program is being conducted in compliance with the [FNA]." *Id.* (quoting 7 U.S.C. § 2020(a)(3)(B)). In other words, USDA is entitled to all the records it requested subject to data and security protocols agreed to by the State Agency and USDA Secretary. *See id.*

---

[10] As the California Court pointed out during the hearing on this preliminary injunction, § 2020(e)(8)(A) requires that each State's "plan of operation . . . shall permit" certain disclosures of the records, rather than the states themselves, indicating § 2020(e)(8)(A) is not a stand-alone source of authority to request records directly from State Agencies but rather a limitation on their plans of operation. *See* Tr. of Proceedings, *California v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N.D. Cal. Oct. 15, 2025), ECF 107 at 40:2–21.

E.    **Non-Compliant States failed to negotiate in good faith in response to USDA's Second Records Request and proposed data and security protocols.**

25.    On November 24, 2025, USDA sent its Second Records Request letter to Non-Compliant States that requested the records exclusively under 7 U.S.C. § 2020(a)(3), provided a list of defined data elements, and proposed extensive data and security protocols. Ex. A ¶ 11; Ex. 7 at 2, 5–7, 8–12. The letter stated that USDA has applied these protocols to the records it received from the compliant State Agencies, which meet FedRAMP High data security. Ex. 7 at 2. As the letter noted, FedRAMP High is a higher security than State Agencies have historically accepted in releasing similar records to USDA in sample form, including recipient social security numbers and addresses. *Id*. The letter emphasized that USDA's purpose in requesting the records was to determine whether SNAP is being conducted in compliance with the FNA and its regulations, and asked the Non-Compliant States to either confirm their acceptance of the protocols or provide the basis for their lack of agreement and any proposed edits to the protocols within seven days. *Id*. at 2–3.

26.    On December 8, 2025, Non-Compliant States replied to USDA contending that USDA lacked authority to obtain the records without a "clear need" and without first meeting their demands. Ex. A ¶ 12; Ex. 8 at 1. Non-Compliant States further provided feedback to USDA's proposed data and security protocols, rejecting key components and proposing that they instead provide "deidentified" records that would omit addresses and other crucial information necessary to analyze household and recipient eligibility. Ex. 8 at 4–5. Non-Compliant States also proposed adding predicate conditions to USDA obtaining the records that are not provided in the FNA or are otherwise legally inapplicable. *Id*. at 6, 13–17.

27.    On December 23, 2025, USDA sent a reply letter, accepting some of Non-Compliant States' proposed edits to the extent that they would not materially undermine the

28

usefulness of the records or interfere with USDA's statutory authority. Ex. A ¶ 13; Ex. 9 at 7. The letter further confirmed that USDA would comply with the FNA and its regulations, which necessarily would include any limitations on sharing or redisclosing the records according to Section 2020(e)(8)(A). *See* Ex. 9 at 7, 12. USDA asked Non-Compliant States to accept the edited protocols within two weeks, and to construe its letter as an advance notification under 7 C.F.R. § 276.4 that noncompliance would result in the disallowance of federal funds for the reimbursement of their administrative costs. *Id*. at 7–8.

28.     On January 9, 2026, Non-Compliant States filed a motion before the California Court to expand or enforce the court's preliminary injunction. Pl. States' Notice of Mot. and Mot. to Enforce or Expand the Prelim. Inj., *California v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N.D. Cal. Jan. 9, 2026), ECF 116 at 7. Non-Compliant States characterized USDA's newest records request as a violation of the California Court's first preliminary injunction and asked the court to bar USDA from "enforcing" the request or "taking any adverse action" against them for not complying with it. *Id.* at 32.

29.     On February 26, 2026, the California Court issued an order that expanded the preliminary injunction to cover USDA's new records request on narrow grounds while rejecting most of Non-Compliant States' arguments.[11] Order Granting in Part Mot. to Expand Prelim. Inj.,

---

[11] The California Court rejected most of Non-Compliant States' APA-styled claims because they were unlikely to succeed on their merits, including that: (1) § 2020(a)(3)'s "inspection and audit" terminology precluded USDA from possessing the records, *id.* at 15 & n.14; (2) Computer Matching Act-based limitations applied to USDA's request for records and protocols, *id.* at 16–17; (3) USDA failed to explain the change in its record collection practice, *id.* at 18; (3) USDA circumvented existing privacy practices relevant to other facets of the FNA and its regulations, *id.* at 18–19; and (4) USDA's records request is redundant to its existing program integrity systems, *id.* at 19. The California Court again did not address Non-Compliant States' *ultra vires* claim,

*California et al. v. U.S. Dep't of Agric.*, 25-cv-06310-MMC, (N. D. Cal. Feb. 26, 2026), ECF 134 at 13-22. In expanding the injunction, the California Court found that USDA did not violate the original injunction by making its Second Records Request. *Id.* at 8–9. At the outset, the California Court agreed with USDA that "a State is not entitled to unreasonably decline to agree to a protocol" when USDA makes a request for records under 7 U.S.C. § 2020(a)(3). *Id.* at 12. However, the California Court reasoned that § 2020(a)(3) and § 2020(e)(8)(A) must be read together, meaning USDA's request for records and proposed protocols under § 2020(a)(3) cannot make a State Agency violate § 2020(e)(8)(A)'s use and redisclosure restrictions by complying with the request. *Id.* at 14.

30.     The California Court found that two sections of USDA's proposed protocols — Section 2.2.1, which provided a list of prohibited purposes, and Section 4.1, which provided a list of access recipients — together with the SORN's routine uses, "would allow USDA to share the requested data with entities other than those covered by § 2020(e)(8)(A)(i), thereby effectively serving as a conduit between [Non-Compliant States] and prohibited entities." *Id.* at 14–15. Thus, the California Court found Non-Compliant States did not unreasonably reject USDA's protocols under these circumstances because complying with the request would have made them violate § 2020(e)(8)(A). *See id.* at 12, 15.

31.     During the hearing on the injunction, the California Court provided guidance to USDA on how it could amend its protocols to make them comply with the use and redisclosure restrictions in § 2020(e)(8)(A). *See* Tr. of Proceedings, *California v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N.D. Cal. Feb. 13, 2026), ECF No. 131 at 32:16 to 33:12, 46:10–48:22, 89:8–

---

which the court previously rejected, or their Spending Clause claim because they did not address either claim in their motion. *Id.* at 5 & n.6.

30

89:18. These amendments included (1) copying verbatim the use and redisclosure limitations in 7 U.S.C. § 2020(e)(8) directly into USDA's proposed protocols; and (2) including a provision in the protocols that expressly clarified that the protocols limited any conflicting routine use in the SORN. *Id.* During the hearing, Non-Compliant States even agreed that these amendments would "largely address" their concerns about USDA's use and redisclosure of the records under § 2020(e)(8) — the only claim that the California Court found meritorious.[12] *Id.* at 47:9–47:21. The California Court's instructions during the hearing for the expansion of the injunction also made clear that USDA could make other records requests according to the court's instructions to remedy its data and security protocols. *See supra*, note 12.

32.      Thus, on February 17, 2026 — after the hearing but before the California Court issued its order — USDA sent Non-Compliant States a letter that contained amended protocols incorporating the California Court's guidance. Ex. A ¶ 14; Ex. 10 at 2. In its letter, USDA stated, "The attached protocols satisfy the two objectives suggested by the Court: it unequivocally confirms in its introduction that: (1) USDA's handling of data it receives from [Non-Compliant States] will be governed by and comply with the text of 7 U.S.C. §§ 2020(a)(3) and (e)(8), and (2)

---

[12] Tr. of Proceedings, *California, et al., v. U.S. Dep't of Agric. et al.*, 3:25-cv-06310-MMC (N.D. Cal. Feb. 13, 2026), ECF No. 131, at 33:10 to 33:12 (The Court: "If you want to just cut them off, all you have to do is import (e)(8) into the protocol"); 46:10–17 ([USDA] can agree to put in a reference to (e)(8)(A) and say we agree to comply with (e)(8)(A) as it is written"); 47:4-8 (The Court: "would that satisfy plaintiffs . . . ?"); 47:9-13 ([Non-Compliant States' Counsel]: "If defendants were willing to copy and paste the provisions of (e)(8) and say that those provisions govern any re-disclosure and any subsequent use of applicant data, I think that would largely address our concern with (e)(8)"); 47:22 to 48:3 (The Court: "Now, apparently they would be satisfied with your airlifting into the protocol the restrictions that are set out in (e)(8). . . . maybe it just reads like (e)(8) reads so that you don't get into [']access['],[']disclosure['], whatever."); 89:8 to 89:17 (The Court: "I'm not telling the USDA what to do. But if you leave the SORN as it is, you may have to make some reference to it in the protocol as to why the protocol controls over the SORN, very much like irrespective of a — some other law might let you do, this law is not going to let you do it. . . . So I'm not telling you [] to amend [the SORN], but you have to deal with it.").

agrees the protocols control notwithstanding any provision of USDA's System of Records Notice (SORN) that could be read to the contrary." *Id.* To effectuate the discussion by the California Court and parties during the hearing, USDA not only incorporated § 2020(e)(8)(A) by reference but copied its provisions verbatim into the protocol. *Id.*

33.     On February 25, 2026, Non-Compliant States replied, once again rejecting USDA's request and protocols based on issues previously rejected by the California Court along with totally new ones. Ex. A ¶ 15; Ex. 11 at 2–3, 17–23. For example, Non-Compliant States said they were now unsatisfied with the language of § 2020(e)(8)(A) and proposed adding new language and other rights not afforded by the statute "to make clear that 7 U.S.C. § 2020(e)(8) does not permit the use or disclosure of data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws." Ex. 11 at 2–3.

34.     Non-Compliant States also added a provision that would subject USDA employees to criminal penalties under state laws for violating the protocols and deleted or restricted many of the key data elements which would prevent USDA from using the records to audit household and recipient eligibility and determine whether Plaintiff States made correct payments. *Id.* at 17, 28–32. For example, Non-Compliant States proposed restricting the data elements to include only recipients but no other household members, removing the data elements of street and mailing addresses, and revising assets and resources to mean what was reported rather than what was known to Non-Compliant States — even though each of these elements directly bear on eligibility and the calculation of benefit allotments. *Id.* at 29–31.

35.     Between March 10 and March 27, USDA continued to attempt to negotiate in good faith with Non-Compliant States through numerous letters, revised protocols, and email correspondence. USDA accepted some of Non-Compliant States' proposed edits to the protocols

but rejected many others that would have imposed duties or sanctions on USDA that were not grounded in or were inconsistent with federal law, including restrictions on USDA that would prevent it from performing its legal duties under the FNA. Ex. A ¶¶ 16–19; Exs. 12–15. Notably, in its March 27th letter, USDA agreed to go above and beyond the California Court's guidance as to § 2020(e)(8) to attempt to satisfy Plaintiff States' central concern about immigration enforcement — USDA proposed a provision in the protocols that explicitly stated: "Section 2020(e)(8)(A) does not provide USDA with authority to respond to a request from DHS for data for purpose(s) of civil immigration enforcement." Ex. 15 at 3, 9.

36.    On March 30, 2026, Non-Compliant States again rejected USDA's records request and proposed data and security protocols. Ex. A ¶ 20; Ex. 16. Non-Compliant States claimed that some other federal law could still allow USDA to share the records despite the many express restrictions in the protocols to the contrary, and they contended that USDA had failed to justify its need for many of the data elements to Non-Compliant States' satisfaction. Ex. 16 at 2–3.

37.    The APA-based lawsuit of Governor Beshear's Office and the other Non-Compliant States — which involves different claims, venue, and relief from the instant matter — continues in the Northern District of California, now on a discovery and summary judgment schedule. Joint Status Report, *California v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N.D. Cal. Mar. 31, 2026), ECF 143 at 2.

38.    Meanwhile, USDA cannot perform its oversight duties under the FNA. And even if USDA prevails in the California action, it will only be able to withdraw administrative funds to enforce compliance. Thus, to perform its oversight duties and stop ongoing violations of the FNA, USDA referred the matter to the U.S. Department of Justice, which can file a complaint for

injunctive relief only before the court in the home district of the non-compliant State Agency. In the case of Defendants, the complaint must go before this Court in this district.

      **F.**      **Defendants refused to comply with USDA's Third Records Request or accept its proposed protocols that conformed with the California Court's guidance.**

39.      On May 15, 2026, USDA sent its Third Records Request letter to Defendant KCHFS under the authority of 7 U.S.C. § 2020(a)(3), which superseded its First and Second Records Requests.[13] Ex. A. ¶ 21; Ex. 17 at 2. The letter explained that "USDA is conducting an inspection and audit of SNAP to ensure that it is being conducted in full compliance with the law and to identify program errors, fraud, waste and abuse." Ex. 17 at 2. The letter also made abundantly clear that this request was "solely for the purposes of 'determin[ing] whether the program is being conducted in compliance'" with the FNA and its regulations." *Id.* at 3.

40.      USDA included a list of defined data elements along with data and security protocols that conform with the exact guidance provided by the California Court, including a verbatim recitation of 7 U.S.C. § 2020(e)(8)(A)'s use and redisclosure limitations and an assurance that the protocols' use and redisclosure limitations control if a conflict arises with the routine uses provided in the SORN. *Id.* at 8. USDA also included the additional representation that § 2020(e)(8)(A) does not provide USDA with the authority to respond to a request from DHS for records for purposes of civil immigration enforcement. *Id.* These key provisions are included:

    a.    "USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks."

---

[13] At the same time, USDA sent similar letters to all non-compliant State Agencies that are responsible for the administration of SNAP in their states because the Non-Compliant State parties, including Governor Beshear's Office, are not directly responsible for the administration of SNAP in their respective states under 7 U.S.C. § 2020(g).

34

b.    "USDA shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2). For the avoidance of doubt, this means that USDA and [the Food Nutrition Service of USDA] (and any person or entity to whom the data is disclosed) shall not: use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code, regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs; . . . "[and] shall not "disclose the data, except to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs."

c.    "Section 2020(e)(8)(A) does not provide USDA with authority to respond to a request from DHS for data for purpose(s) of civil immigration enforcement."

*Id.* at 15–16.

41.    The letter requested that Defendants "respond in writing within seven days" of the date of the letter with confirmation of their agreement to produce the records subject to the attached data and security protocols. *Id.* at 10. Alternatively, the letter requested that Defendants respond in writing within the same period with the basis for their refusal. *Id.* The letter did not include a warning to Defendants that noncompliance would result in the suspension or disallowance of federal funds if Defendants refused. *Id.* As the FNA's regulations require USDA to issue such warnings before suspending or disallowing a State Agency's federal funds, the USDA's records request to Defendants does not implicate the claim and relief that is before the California Court. *See* 7 C.F.R. § 276.4.

42.    On May 22, 2026, Non-Compliant States, rather than Defendants, sent USDA a single reply letter in which they refused to provide the requested records or agree to the proposed data and security protocols. Instead, Non-Compliant States stated that they intended to wait until their APA-based lawsuit is resolved on its merits. Ex. A ¶ 22; Ex.18 at 2. Non-Compliant States did not provide any proposed edits to USDA's data and security protocols and asserted that the bases for their previously raised rejections still stand. *Id.*

43.     As of the date of this filing, Defendants have not independently responded to USDA's letter dated May 15, 2026, or its request for records and proposed data and security protocols, other than to acknowledge receipt. Ex. A ¶ 23.

44.     The U.S. Secretary of Agriculture has made a formal request to the Attorney General of the United States pursuant to 7 U.S.C. § 2020(g). The Secretary requested that the Attorney General seek injunctive relief to compel Defendants to comply with the FNA and its regulations, including USDA's request for records under 7 U.S.C. § 2020(a)(3).

## CLAIM FOR RELIEF

### Declaratory Judgment and Permanent Injunction

45.     Plaintiff, United States of America, realleges and incorporates herein by reference each allegation and paragraph set forth previously.

46.     Under 7 U.S.C. § 2020(a)(3), the FNA provides clear, mandatory language that USDA, through the Secretary of Agriculture, has the right to obtain, subject to data and security protocols, all records necessary to determine whether SNAP is being conducted in compliance with the FNA. Thus, a State Agency must comply with USDA's request for records under 7 U.S.C. § 2020(a)(3) to comply with the FNA.

47.     An agreement between USDA and a State Agency on data and security protocols for the transfer and storage of such records is not a condition precedent to a State Agency's obligation to comply with USDA's request for records under 7 U.S.C. § 2020(a)(3).

48.      A State Agency is not entitled to unreasonably decline to agree to data and security protocols. Indeed, a State Agency's refusal to agree to reasonable protocols would defeat the mandatory nature of 7 U.S.C. § 2020(a)(3) and permit a State Agency to forever avoid its obligation to provide USDA the records.

49.       Defendants are in violation of the FNA under 7 U.S.C. § 2020(a)(3) by failing to comply with USDA's Third Records Request dated May 15, 2026, by unreasonably rejecting USDA's proposed data and security protocols, and by failing to negotiate those protocols in good faith.

50.       Under 7 U.S.C. § 2020(g), Plaintiff is entitled to obtain injunctive relief from this Court upon showing that Defendants have failed to comply with any term of the FNA, including 7 U.S.C. § 2020(a)(3).

51.       Plaintiff has completed the prerequisites for obtaining injunctive relief under 7 U.S.C. § 2020(g): the Secretary of Agriculture has (a) determined that Defendants have failed to comply with 7 U.S.C. § 2020(a)(3) without good cause; (b) informed Defendants of their failure and provided sufficient time for Defendants to correct such failure; (c) determined that Defendants have failed to correct the noncompliance; and (d) referred the matter to the Attorney General with a request that injunctive relief be sought to require compliance forthwith by Defendants; and the Attorney General has filed suit before this Court, the appropriate U.S. district court having jurisdiction of the geographic area in which the Defendants are located. *See* 7 U.S.C. § 2020(g); *supra*, ¶¶ 78–83.

## PRAYER FOR RELIEF

WHEREFORE, United States of America respectfully requests that this Court enter judgment in its favor and grant the following relief:

52.       A declaratory judgment that Defendants are in violation of the FNA, 7 U.S.C. § 2020(a)(3), by failing to comply with USDA's Third Records Request dated May 15, 2026, by unreasonably rejecting USDA's proposed data and security protocols, and by failing to negotiate those protocols in good faith.

53.    An injunction that orders Defendants to comply with USDA's Third Records request dated May 15, 2026, within seven days.

54.    Such other relief as the Court deems just and proper.

Dated: June 26, 2026

Respectfully submitted,

COLIN M. McDONALD
Assistant Attorney General
National Fraud Enforcement Division

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TYLER BECKER
Counsel to the Assistant Attorney General
Civil Division

LISA K. HSIAO
Acting Director
ZACHARY DIETERT
ROGER GURAL
Assistant Directors
Civil Division, Enforcement & Affirmative
Litigation Branch

/s/ *Cadesby Cooper*
CADESBY B. COOPER (NY # 5415583)
COLIN W. TRUNDLE (MN # 0401934)
KYU YUN KIM (DC # 1618739)
DANIEL J. PETROKAS (NY # 5779103)
Trial Attorneys
United States Department of Justice
Civil Division, Enforcement & Affirmative
Litigation Branch
450 5th Street, N.W.
Washington, DC 20001
Tel: (202) 451-7687
Email: cadesby.b.cooper@usdoj.gov

*Counsel for Plaintiff United States of America*